**Exhibit 1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ABDULSALAM ALI ABDULRAHMAN AL-HELA, et al., |
| Petitioners, |
| v. |
| GEORGE W. BUSH, et al., |
| Respondents. |

Civil Action No. 05-1048 (RMU)

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO
PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION REQUIRING ADVANCE NOTICE
OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO**

Respondents hereby respond to petitioners' May 26, 2005 motion for a temporary

restraining order and preliminary injunction that would require respondents to provide counsel

for petitioners and the Court with 30-days advance notice of any intended removal of petitioner

from Guantanamo.  Petitioners' motion should be denied because they have not come close to

establishing a factual or legal basis for the relief they seek.[1]

---

[1] Similar motions have been filed over the past three months in numerous other Guantanamo detainee habeas cases, with varying outcomes.  Compare, e.g., Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005) (granting preliminary injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31, 2005) (ordering advance notice as part of stay), with Almurbati v. Bush, 366 F. Supp. 2d 72, 2005 WL 851934 (D.D.C. Apr. 14, 2005) (Walton, J.) (denying preliminary injunction); Al-Anazi v. Bush, — F. Supp. 2d —, Civ. A. No. 05-345 (JDB), 2005 WL 1119602 (D.D.C. Apr. 21, 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op. (D.D.C. May 2, 2005) (same).

This week, respondents have begun filing notices of interlocutory appeal, as such notices came due, of orders that have been entered in various cases barring any transfer or repatriation unless preceded by 30-days advance notice to counsel and the Court.

## BACKGROUND

**A.    Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States captured or took

custody of a number of enemy combatants, some of whom are being held at the Guantanamo Bay

Naval Base ("Guantanamo") in Cuba.

**B.    Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining enemy combatants

longer than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee

Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of

Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[2]  The

Department of Defense ("DoD") conducts at least annual reviews of each Guantanamo detainee

to determine whether continued detention is warranted based on factors such as whether the

detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7;

Prosper Decl. ¶ 2.  Those annual reviews include those currently being conducted through

---

[2] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two
prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar
motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration
submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ.
A. No. 04-1254 (HHK), but is equally applicable to the instant case.

Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[3]  As part of the Administrative

Review Board process, counsel who represent detainees have been invited to make written

submissions concerning whether further detention is appropriate; in these submissions, counsel

are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in

fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official

grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another

government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Over 200 Guantanamo detainees

have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl.

¶ 2.

Where continued detention by the United States is not warranted, a detainee may be

transferred to the control of another government, typically the government of his country of

citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers

Guantanamo detainees, under appropriate circumstances, to the control of other governments for

continued detention, investigation, and/or possible prosecution when those governments are

willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not

pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Such

governments can include the government of a detainee's country of citizenship, or another

---

[3]  See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004,
re: Administrative Review Procedures for Enemy Combatants in the Control of the Department
of Defense at Guantanamo Bay Naval Base, Cuba, available at
<<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum
dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy
Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at
<<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

country that may have law enforcement, prosecution, or other interest in the detainee.  Waxman

Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation,

and/or prosecution occur after a dialogue between the United States and the receiving

government, which may have been initiated by either the United States or the receiving

government.  Waxman Decl. ¶ 5.  The purpose of such dialogue is to ascertain or establish what

measures the receiving government intends to take, pursuant to its own domestic laws and

independent determinations, that will ensure that the detainee will not pose a continuing threat to

the United States and its allies.  Id.  In all cases where a transfer is consummated, the detainee is

transferred entirely to the custody and control of the other government; once transferred, the

individual is no longer in the custody or control of the United States.  Id.  Any future detention of

that individual is by the foreign government pursuant to its own laws and not on behalf of the

United States.  Id.  In fact, most of the 67 Guantanamo detainees who have been transferred by

the Department of Defense to the control of their home countries for continued detention,

investigation, and/or prosecution have been released from detention some time after the transfer.

Id.

In any transfer, a key concern is whether the foreign government will treat the detainee

humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4;

Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee

to a country where the United States believes it is more likely than not that the individual will be

tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is

undertaken, typically involving the Department of State, in which appropriate assurances

4

regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.  Id.  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant. Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the U.S. Government's annual Human Rights Reports) and the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl. ¶ 7.   When

5

evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where the Department of Defense decided not to transfer detainees to their country of origin because of torture concerns.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations. Prosper Decl. ¶ 9.  If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments

6

would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[4]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

## I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v.

---

[4] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  Id.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such _imminence_ that there is a clear and present need for equitable relief to prevent irreparable harm." _Id._ (citations and internal quotation marks omitted; emphasis in original).[5]

## II.    PETITIONERS FAIL TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Some Judges of this Court have required advance notice of any transfer through a preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention. Respondents respectfully suggest that these decisions rest on faulty logic. The primary relief sought by petitioners is release from custody. Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no

---

[5] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of the stay of proceedings, pending related appeals, that respondents have requested. As Judge Bates concluded, however, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." _Al-Anazi_, 2005 WL 1119602, at *9 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)). Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioners seek might be embodied, petitioners should be required to satisfy the preliminary injunction standard in order to justify that relief.

longer is interested in maintaining.[6]  "The ultimate objective of a habeas petition is release from

custody."  Almurbati, 2005 WL 851934, at *6.  As Judge Walton found, "once the respondents

release the petitioners from United States custody . . . they will have obtained the result requested

and at that point there will be no further need for this Court to maintain jurisdiction."  Id. at *7,

see also Al-Anazi, 2005 WL 1119602, at *9 ("Every habeas petition, including this one, is

ultimately about obtaining release from detention, and where, as here, the United States will

relinquish custody of the detainee to the home government there is nothing more the Court could

provide to petitioners." (citation omitted)).

        The fact that release from United States custody will give petitioners all the relief they

can seek through habeas is not altered by the possibility that, upon being released from the

custody of the United States, a former detainee may be taken into custody and detained in the

receiving country based on that country's independent interests and determinations.  As

respondents' declarations make clear, when the Department of Defense transfers detainees to the

control of other governments, the detainees are no longer subject to the custody or control of the

United States, and any subsequent confinement in the receiving country is based on the receiving

government's independent decision, based on its domestic laws, that the individual should be

detained.[7]  Waxman Decl. ¶ 5.  Indeed, even if the United States transfers a detainee to his home

_____

        [6] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction
of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October
2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of
detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4; see also supra note 3
(citing documents showing that administrative review process for considering transfers and
repatriations predates Rasul and the filing of this and most other detainee habeas petitions).

        [7] As explained below, see infra p. 20-21, it would be wholly inappropriate for the Court to
(continued...)

9

government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws.  The Court should therefore reject petitioners' suggestion that the possibility of future detention in an individual's home or another country based on that country's independent interests and determinations constitutes irreparable injury warranting an injunction.[8]

**B.**    **Speculation that the United States Will Defy its Own Policy by Transferring Detainees to Countries Where They Will be Tortured Does Not Warrant a Preliminary Injunction**

Nor can petitioners carry their burden to show irreparable injury that is "certain and great . . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by rife speculation that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send petitioner to a country where he will be tortured.  Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country where the

---

[7](...continued)
review or question a foreign government's detention of its own nationals pursuant to its own laws.

[8] In ordering advance notice, some Judges of this Court have relied upon the decision in Abu Ali v. Ashcroft, 350 F. Supp. 2d 28 (D.D.C. 2004), as illustrating that a transfer could hypothetically result in some type of "constructive custody" situation.  However, the declarations submitted herewith make clear that any transfer to a foreign government is a complete transfer in which the United States relinquishes custody entirely, refuting the notion of a "constructive custody" relationship.  For that reason as well as several other important distinctions, the author of the Abu Ali decision described it as "not particularly instructive" in the context of these Guantanamo detainee motions seeking advance notice of transfers.  Al-Anazi, 2005 WL 1119602, at *7 n.9.

United States believes it is more likely than not that the individual will be tortured. Prosper
Decl. ¶ 4; Waxman Decl. ¶ 6. This policy is implemented through a process that contains several
levels of precautions and safeguards. To conclude that an injunction is nevertheless necessary
because petitioner otherwise faces a certain and great risk of torture and mistreatment upon
transfer would require the Court to assume, without any evidence, that the United States' policy
and practice is somehow a sham or pretext. There is no valid basis for such an assumption.

Rather, as Judge Walton has found, respondents' sworn declarations "directly refute the
petitioners' allegations of their potential torture, mistreatment and indefinite detention to which
the United States will in some way be complicit." Almurbati, 2005 WL 851934, at *5.
Moreover, Judge Bates found that the assortment of magazine and newspaper stories relied upon
by many detainee-petitioners in these cases failed to form a factual predicate justifying an
injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in
that case] concede that none of these incidents involve the transfer of detainees out of
Guantanamo." Al-Anazi, 2005 WL 1119602, at *2; see also id. at *8-*9. Thus, petitioners have
failed to show that either the prospect of relinquishment from United States custody or
unfounded speculation about possible torture in a foreign country constitute irreparable harm that
must be remedied by a preliminary injunction.

**III.    PETITIONERS CANNOT SHOW A LIKELIHOOD OF SUCCESS
        IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
        IN ACCORDANCE WITH THE POLICIES EXPRESSED IN
        RESPONDENTS' DECLARATIONS**

Petitioners fare no better on the second prong of the preliminary injunction analysis,
which requires them to show that they are likely to succeed, following notice, in preventing a

11

transfer from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 (D.C. Cir.), and of petitioner's claim that he is being wrongfully detained, it is not the likelihood of success on those issues or claims that matters for purposes of the instant motion for preliminary injunction. Rather, the likelihood of success analysis focuses on the legal basis for petitioners to obtain an order preventing termination of detention by the United States in the manner described in the declarations submitted herewith.  See Al Anazi, 2005 WL 1119602, at *5 ("[T]he presence of a sound basis to challenge the legality of one's detention does not at all imply that there exists a sound basis to challenge the legality of one's transfer.  Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their transfer from Guantanamo, not to their detention at Guantanamo (emphasis in original)); Abdah, 2005 WL 711814, at *4 ("if there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted" (emphasis in original)).

Petitioners have not identified any valid source of legal authority for such an order. Moreover, even if such a source existed, the Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a foreign nation's justice system and the procedures or treatment that an individual may experience in a foreign nation, weighs heavily against petitioners' likelihood of success in contesting a transfer or repatriation.

12

### A.    No Valid Legal Basis Exists for a Judicial Order
Enjoining Transfer or Repatriation of an Individual
Previously Detained by the United States as an Enemy Combatant

### 1.    Protection of the Court's Jurisdiction

As discussed above in the context of irreparable harm, see supra Section II.A, protection

of the Court's jurisdiction would not be an appropriate legal rationale for an order forbidding

transfer or repatriation of an individual detained at Guantanamo, because relinquishment from

United States custody (which occurs in every such transfer or repatriation) represents the full

extent of relief that petitioners could obtain in habeas.  See Almurbati, 2005 WL 851934, at *7

("[O]nce the respondents release the petitioners from United States custody . . . they will have

obtained the result requested and at that point there will be no further need for this Court to

maintain jurisdiction."); see also Al-Anazi, 2005 WL 1119602, at *9.[9]  Indeed, as Judge Bates

concluded, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and ultimately

determine that the United States may no longer detain the petitioners, the parties and the Court

would find themselves in precisely the same position in which they find themselves now – with

the respondents taking steps to transfer those individuals out of United States control, and the

petitioners compelled to come forward with some legal or evidentiary basis to prevent transfer to

---

[9] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody."  Al-Marri v. Bush, Civ. A. No. 04-2035 (GK), 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioners may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

an 'undesirable' country." Al Anazi, 2005 WL 1119602, at *7.  Thus, petitioners do not enjoy a

likelihood of success in obtaining an order barring a transfer in order to "protect" the Court's

jurisdiction.

**2.    Federal Rule of Appellate Procedure 23(a)**

Federal Rule of Appellate Procedure 23(a) does not provide a legal basis for enjoining the

type of transfer at issue (i.e., a transfer to a foreign government constituting a complete

relinquishment of custody by the United States), or for concluding that petitioner has a likelihood

of success on such claims.  For one thing, that Rule by its terms does not apply in the procedural

posture of the instant petition, which has just recently been filed and in which no decision has

made of which appellate review is pending.  See Fed. R. App. P. 23(a) (applying "[p]ending

review of a decision in a habeas corpus proceeding" and only to "the prisoner" in whose

proceeding that decision was made); see also Fed. R. App. P. 1(a)(1) ("These rules govern

procedure in the United States courts of appeals."); Order dated May 3, 2005, in Battayav v.

Bush, Civ. A. No. 05-714 (RBW) (D.D.C.), at 1 n.1 (rejecting Fed. R. App. P. 23(a) argument in

case that, like this one, did not have a pending appeal); see also Al Anazi, 2005 WL 1119602, at

n.*9 n.11 ("The Court notes that petitioners did not even attempt to argue in their papers that

Federal Rule of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners'

habeas petition is not presently on appeal.").

Even if Federal Rule of Appellate Procedure 23(a) could somehow be deemed to find

application in this case notwithstanding the absence of any decision in this case that is on appeal,

that Rule simply does not apply to a situation, such as a repatriation, in which the United States

relinquishes custody of an individual altogether.  Rule 23(a) is designed to ensure that, in

14

situations where a prisoner is transferred from one custodian subject to federal habeas

jurisdiction to another custodian subject to federal habeas jurisdiction, but remains in the custody

of the United States (or relevant state thereof), the court is able to appropriately substitute the

successor custodian as the respondent.  See Fed. R. App. P. 23(a) ("the court, justice, or judge

rendering the decision under review may authorize the transfer and substitute the successor

custodian as a party"); Wood v. United States, 873 F. Supp. 56, 57 (W.D. Mich. 1995) (declining

to adopt expansive construction of Rule 23(a) where "the purposes of Rule 23(a) would not be

furthered," which purposes are "reflected in the provisions of the rule for substituting the

successor custodian as a party").  Critically, nothing in Rule 23(a), nor any other provision of

law, operates to restrict the United States from relinquishing custody of an individual, which,

after all, is the ultimate object of a habeas corpus case.  Cf. Brady v. United States Parole

Comm'n, 600 F.2d 234, 236 (9th Cir. 1979) (Rule "does not touch upon release" by government).

        In light of its focus on "substitut[ing] the successor custodian as a party," Fed. R. App.

Proc. 23(a), it does not make sense to read the Rule, as petitioners apparently do, to cover

situations that involve not a transfer from one United States custodian to another United States

custodian, but rather a relinquishment of United States custody altogether in connection with a

transfer or repatriation to a foreign nation.  In that situation, there is no "successor custodian"

subject to federal habeas jurisdiction who could be substituted as a party.[10]  Moreover, upon

relinquishment of United States custody, the relief available in habeas would have been received

---

        [10] This is so regardless of whether the foreign nation to which the former Guantanamo
detainee is repatriated or transferred may subsequently detain the individual as a function of its
own law enforcement, criminal justice, or other interests, as would be its prerogative in any
transfer, including even a transfer for release.

and the habeas case therefore would be moot, making substitution of a successor custodian
unnecessary.

Indeed, other than recent orders on similar motions in other Guantanamo detainee cases,
our research has not uncovered a single case where Federal Rule of Appellate Procedure 23(a)
has been held to apply to the transfer of a detainee to a foreign country and concomitant
relinquishment of custody by the United States, even assuming arguendo that petitioners could be
considered "prisoners" within the meaning of the Rule.  To the contrary, Rule 23(a) cases had
involved transfers from one United States (or state) custodian to another United States (or state)
custodian where the prisoner remained in the custody of the United States (or state authorities).
See, e.g., Goodman v. Keohane, 663 F.2d 1044, 1047 (11th Cir. 1981) (involving transfer from
federal correctional facility in Miami, Florida to a federal penitentiary in Terre Haute, Indiana);
see also Brady, 600 F.2d at 236 (Rule 23 "was promulgated to alleviate jurisdictional problems
sometimes created by geographical limits on habeas corpus jurisdiction").[11]

--------

[11]  That Rule 23(a) does not cover a transfer or repatriation resulting in an individual
being released from United States custody is underscored by the Supreme Court's handling of the
issue in Rasul v. Bush, 124 S. Ct. 2686 (2004).  While Rasul was pending, the United States
transferred two named petitioners therein to the custody of the United Kingdom.  See Press
Release dated Mar. 9, 2004, at <<http://www.defenselink.mil/releases/2004
/nr20040309-0443.html>> ("The Department of Defense announced today that it transferred five
British detainees from Guantanamo Bay, Cuba, to the British government today.").  Even though
the Supreme Court has a rule virtually identical to Rule 23(a), the Court did not give any hint of
perceiving any violation of its rule.  Instead, it simply noted the transfers and moved on to
consider the claims of the petitioners who remained before the Court.  See Rasul, 124 S. Ct. at
2690 n.1.  The notable absence of any suggestion that Supreme Court Rule 36 came into play in
these circumstances strongly militates against construing the identically worded Federal Rule of
Appellate Procedure to cover the same situation.

In Abdah v. Bush, the Court (Kennedy, J.) declined to make any inference from the
Supreme Court's treatment of the Rasul transfers "both because there is no indication in Rasul
(continued...)

### 3.    International Treaties

Some detainee-petitioners in these cases have claimed, although no Judges to date have adopted as a basis for ordering relief, that any transfer or repatriation would violate certain international treaties such as the Geneva Conventions, the International Covenant on Civil and Political Rights ("ICCPR"), and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT").  These claims are not valid and do not provide a basis for finding a likelihood of success in obtaining an order barring a transfer or repatriation.  First, not one petitioner has identified any provision in any treaty that is in conflict with the United States' policy governing transfers and repatriations of individuals detained at Guantanamo by the Department of Defense, or that would be violated by a transfer or repatriation undertaken in accordance with that policy.  The most petitioners have been able to muster in this regard is to speculate about hypotheticals, not tethered to any actual facts in evidence, that they claim could make out a violation (e.g., a transfer to a country that would mistreat the individual at the behest of the United States).  To prevail on a preliminary injunction, however, the "merits" on which petitioners must show that they have a likelihood of success are those involving the real-world facts of the case, not some hypothetical facts that they postulate or read about in sensationalistic media stories.

---

[11](...continued)
whether the two named petitioners were transferred into foreign custody or released outright, and because neither party presented the issue to the Supreme Court."  2005 WL 711814, at *5.  The named petitioners in question were transferred to the custody of the foreign government, which subsequently opted to release them, events of which the Supreme Court was advised after the fact.  And if petitioner's reading of Fed. R. App. P. 23, and by extension S. Ct. R. 36, were correct, the absence of objection would not have dispensed with the need to obtain court authorization in Rasul, since neither rule carves out an exception for transfers to which a prisoner consents.

Second, numerous courts have held that the ICCPR and CAT do not, in and of themselves, give rise to judicially enforceable rights.[12]  Therefore, the Court does not have jurisdiction to grant an injunction based on any perceived risk of a violation of the ICCPR or CAT.[13]  Whether the Geneva Conventions give rise to judicially enforceable rights, and whether Taliban and al Qaeda detainees are entitled to claim protections under those Conventions, are issues currently before the Court of Appeals in Hamdan v. Rumsfeld, D.C. Cir. No. 04-5393 (argued and submitted Apr. 7, 2005).  In any event, petitioners fail to articulate any credible basis for expecting that a transfer or repatriation in accordance with the United States policy expressed in the attached declarations would violate any aspect of the Geneva Conventions.

---

[12] Sosa  v. Alvarez-Machain, 124 S. Ct. 2739, 2767 (2004) (ICCPR); In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 480 (D.D.C. 2005) (ICCPR); Khalid v. Bush, 355 F. Supp. 2d 311, 327 (D.D.C. 2005) (ICCPR and CAT); Auguste v. Ridge, 395 F.3d 123, 132 n.7 (3d Cir. 2005) (CAT); Iguarta de la Rosa v. United States, 32 F.3d 8, 10 n.1 (1st Cir. 1994) (ICCPR); Hawkins v. Comparet-Cassani, 33 F. Supp. 2d 1244, 1257 (C.D. Cal. 1999) (CAT and ICCPR), other orders rev'd, 251 F.3d 1230 (9th Cir. 2001); White v. Paulsen, 997 F. Supp. 1380, 1386-87 (W.D. Wash. 1998) (CAT and ICCPR); Matter of Extradition of Cheung, 968 F. Supp. 791, 802-03 & n.17 (D. Conn. 1997) (CAT and ICCPR).

[13] This proposition is not altered by the fact that Congress has enacted legislation and regulations have been promulgated that implement the CAT by providing limited review in a certain narrow category of immigration cases.  See Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. §§ 1208.16-1208.18.  The FARR Act expressly provides that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a) [prohibiting the return of persons when there are substantial grounds for believing they will be tortured], except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252)."  See FARR Act § 2242(d).  This case does not involve a final order of removal under section 242 of the Immigration and Nationality Act, and neither the FARR Act nor the regulations thereunder create jurisdiction to review any CAT claims in the circumstances presented here.  See Al-Anazi, 2005 WL 1119602, at *5.

**B.    Separation-of-Powers Principles Militate Heavily Against Petitioners' Likelihood of Success**

Further, even if some valid claim or other legal basis existed for judicial involvement in transfer or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice requirement to support and facilitate such involvement, the separation of powers would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S. 354, 383 (1959)).[14]  If the Court were to entertain petitioners' claims to a right to contest repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review of a transfer or repatriation decision could involve scrutiny of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the

---

[14] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459 F.2d at 1225.

adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns. Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'"  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)); see Al-Anazi, 2005 WL 1119602, *6 (holding that this "well-established line of cases in the extradition context" "counsel[s] even further against judicial interference").  This principle is sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack.  While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

20

laws and the manner in which they are enforced." <u>Id.</u> at 1067.  "It is the function of the Secretary

of State to determine whether extradition should be denied on humanitarian grounds."  <u>Id.</u>

<u>Accord</u> <u>Escobedo v. United States</u>, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

omitted)); <u>Peroff v. Hylton</u>, 563 F.2d 1099, 1102 (4th Cir. 1977); <u>Matter of Extradition of</u>

<u>Sandhu</u>, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); <u>Hoxha v. Levi</u>, No. Civ. A. 05-1211, 2005

WL 1244913, *6-*7 (E.D. Pa. May 25, 2005) (holding that allegations that individual would be

tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an

appropriate subject for judicial inquiry).  <u>See generally</u> Jacques Semmelman, <u>Federal Courts, the</u>

<u>Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings</u>, 76 Cornell L.

Rev. 1198 (1991).[15]

The force of these principles is not diminished by the fact that petitioners seek a broad

advance notice requirement that would cover not merely an extradition, but <u>any</u> kind of transfer

---

[15] In <u>Cornejo-Barreto v. Seifert</u>, 218 F.3d 1004 (9th Cir. 2000), two Judges on a panel of
the Ninth Circuit stated in dicta that a permanent resident within the United States facing
extradition could seek judicial review of his claim that he would be tortured if extradited.  <u>But
see</u> <u>id.</u> at 1017 (Kozinski, J., concurring) (not joining this part of the panel opinion).  However, in
a later appeal growing out of the same case, another panel of the Ninth Circuit disagreed with
that statement, recognizing it as dicta, and held, consistent with previous Ninth Circuit precedent,
<u>Lopez-Smith v. Hood</u>, 121 F.3d 1322 (9th Cir. 1997), that the Rule of Non-Inquiry barred
judicial review of such a claim.  <u>Cornejo-Barreto v. Seifert</u>, 379 F.3d 1057 (9th Cir. 2004).
While that appeal was still pending (the Ninth Circuit having granted rehearing en banc), the case
became moot when the foreign government seeking extradition withdrew its request.
Accordingly, the Ninth Circuit dismissed the appeal, vacating as moot the 2004 panel opinion
and the district court opinion it reviewed.  <u>Cornejo-Barreto v. Seifert</u>, 389 F.3d 1307 (9th Cir.
2004).

or repatriation – indeed, any "removal" from Guantanamo.  The considerations that underlie the

Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the

constitutional separation of powers.[16]  See Matter of Requested Extradition of Smyth, 61 F.3d

711, 714 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as

institutions and ill-advised as a matter of separation of powers and foreign relations policy to

make inquiries into and pronouncements about the workings of foreign countries' justice

systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that

the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes,

459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those

embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations

of unfairness in a foreign nation's trial of a U.S. citizen).  Thus, petitioners cannot turn to the

---

[16] Some detainee-petitioners in these cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision.  Kin-Hong, 110 F.3d at 111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance.  See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

    Moreover, to the extent that petitioners may contend that the only possible way to repatriate them would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country as well as the credibility and adequacy of a foreign government's assurances.  Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'" (quoting Chicago & Southern, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming transfer or repatriation in order to enable petitioners to seek a judicial order blocking it.  Neither the Court's habeas corpus jurisdiction nor Federal Rule of Appellate Procedure 23(a) support the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court.  Likewise, the treaties petitioners cite are not judicially enforceable, but, more importantly, respondents' policies and practices concerning transfers and repatriations are consistent with them.  And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

## IV.  AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioners seek advance notice is to enable them to seek an order blocking a transfer or repatriation decision that the Executive would already have

23

made after consultation and coordination with the foreign government in question. By its very nature, such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary Waxman and Ambassador Prosper submitted herewith. See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. See supra Section III.B (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). An advance notice requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the acquiescence of another Branch (i.e., the Judiciary) would be required before a transfer or repatriation could be effected, and would also inject delays into future transfers. These harms weigh heavily against entry of a preliminary injunction.

## V.     AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility. Petitioners undoubtedly will invoke truisms such as that the public interest disfavors torture, but that aspect of the public interest is already well served by the existing policies and processes governing transfers and repatriations of Guantanamo detainees, as described in the accompanying declarations.[17] As Judge Bates held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees. See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 2005 WL 1119602, at *9. Here, as well, the public interest disfavors an injunction.

---

[17] Similarly, while two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Marri, 2005 WL 774847, at *6; Abdah, 2005 WL 711814, at *6, that formulation merely begs the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or imminent here and stand to be prevented by an injunction. As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioners may have, constitutional or otherwise. The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

25

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioners' motion for a temporary restraining order or preliminary injunction be denied.

Dated:  June 3, 2005                          Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

DAVID B. SALMONS
Assistant to the Solicitor General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

  /s/ Robert J. Katerberg
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents