*PREVIOUSLY FILED WITH THE CSO*
*AND CLEARED FOR PUBLIC FILING*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALEH ABDULLA AL-OSHAN, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | Civil Action No. 05-0520 (RMU) |
| NASSER MAZYAD AL-SUBAIY, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | Civil Action No. 05-CV-1453 (RMU) |
| ABDULSALAM ALI ABDULRAMAN AL-HELA, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | Civil Action No. 05-CV-1048 (RMU) |
| SAEED MOHAMMED SALEH HATIM, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | Civil Action No. 05-CV-1429 (RMU) |

| | |
|---|---|
| SALIM MOHAMMED ADAM BIN AMIR, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-CV-1724 (RMU) |

## PETITIONERS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL INFORMATION RELATED TO MEDICAL TREATMENT

Petitioners respectfully submit this reply memorandum in further support of their Motion to Compel Information Related to Medical Treatment. In its response, the Government has gone to great lengths to oppose Petitioners' motion seeking access to counsel and information related to their participation in ongoing hunger strikes – setting forth, for example, the various procedures undertaken by the Government to preserve a hunger-striking detainee's life, or seeking to preempt any potential arguments a petitioner might hypothetically bring in protest of his treatment by Respondents as a result of medical intervention related to a hunger strike. Such arguments, however, are inapposite to the exigent circumstances presented by Petitioners and the narrowly-tailored, limited remedies they seek – all of which are easily manageable by the Government, well within the boundaries of the Protective Orders governing these cases, and fundamental to the principle of ensuring timely, adequate access to counsel and the Courts.

Counsel for Petitioners do not seek to micromanage the operations of Guantánamo. They simply seek to prevent the death of individuals who have, understandably, lost hope after four years of isolated detention, without charge, within

Guantánamo. Contrary to Respondents' assertions, Petitioners' purpose is not back-end discovery. Respondents' complete refusal to provide counsel for Petitioners any of the requested information they initially requested – refusing even to confirm the hospitalization of a client – is alone significant enough to warrant intervention to ensure that Petitioners' access to counsel and the Court is not reduced to a meaningless exercise.

Furthermore, Respondents urge the Court to accept their claims based on their mere assertions. Petitioners respectfully remind the Court that the representations made by the Government with respect to the conditions at Guantánamo and the treatment of Petitioners has proven incorrect – with devastating consequences – on numerous occasions. For example,

- The Government repeatedly made claims that it treated Petitioners humanely and within the requirements of the law.

- *In fact*, the record of torture and abuse perpetrated against Petitioners, and ultimately conceded by the Government, has shocked the conscience of the American public and the world. *See, e.g.,* Adam Zagorin and Michael Duffy, *Inside the Interrogation of Detainee 063*, Time Mag., June 20, 2005.

- The Government repeatedly stated – and continues to do so here – that Petitioners receive adequate medical care.

- *In fact*, the Government's own records have indicated that doctors are, at the very least, complicit in the interrogations of Petitioners. M. Gregg Bloche, M.D., J.D., and Jonathan H. Marks, M.A., B.C.L., *Doctors and Interrogators at Guantanamo Bay*, 353 New Eng. J. Med. 6, 8 (2005).

- The Government made claims to this Court, this past spring, that Petitioners would not be transferred to any facility outside of United States custody where it would be "more likely than not" that a detained individual would face torture.

- *In fact*, the Government has publicly stated that it is actively pursuing agreements with Petitioners' home countries– including Saudi Arabia and Afghanistan – nations that the Department of State has repeatedly held perpetrate some of the world's worst human rights violations against

3

prisoners. *See* Rowan Scarborough, *U.S. to Fund Prison in Afghanistan; Gitmo Numbers Sought to be Cut*, Wash. Times, Sept. 14, 2005, at A04.

- The Government made claims before the Court that the ongoing hunger strike, confirmed by all *habeas* counsel who visited the base, was simply a "rumor." *See* Mot. at 3.

- *In fact*, faced with the reports and public outrage, the Government was forced to concede the existence of the hunger strike. *See* Mot. at 6; Ex. F.

That Respondents continue to argue that the Court should rely on only the Government's word that Petitioners' well-being is adequately protected – when the events of recent years have clearly demonstrated otherwise – only buttresses the need to allow Petitioners reasonable methods to access counsel, so that the parties may approach the Court if judicial intervention is deemed necessary. Respondents' simple assertion that they are protecting the interests of Petitioners, thus, cannot and should not be supported by the Court as adequate. For these reasons, and those set forth in greater detail below, Petitioners' motion should be granted.

## I. PETITIONERS' REQUESTED REMEDY IS NARROWLY TAILORED TO SERVE THE PUBLIC INTEREST WITHOUT UNDUE INTERFERENCE WITH MILITARY OPERATIONS

Petitioners' opening memorandum makes clear that the relief requested is the minimum necessary in order to protect Petitioners' rights without unduly interfering with military operations. Yet Respondents utterly mischaracterize Petitioners' motion. Petitioners only sought relief from the Court after Respondents refused to inform Petitioners' counsel if Petitioners were participating in a hunger strike and/or were hospitalized. If Respondents had simply provided that information, Petitioners' counsel

may not have needed to file the instant motion.[1] Faced with utter refusal by the government to even respond to undersigned counsel's queries in an individualized manner, *see* Mot. Ex. I, Remes Affidavit ¶ 8; Mot. Ex. K, and increasingly grave reports from other *habeas* counsel as to the progression of the hunger strike, counsel for Petitioners were forced to seek the instant relief.[2]

Counsel for Petitioners requested a simple form of relief – notice if their clients are participating in the hunger strike, and additional notice if their clients are hospitalized or severely ill as a result of the hunger strike. Respondents, meanwhile, attempt to avoid these issues by asserting that Petitioners' motion should be denied because, for instance, other courts have previously denied constitutional challenges to the involuntary feeding of hunger-striking prisoners. *See* Op. at 13. The Government has conveniently ignored the point of this motion – Petitioners do not challenge involuntary forced-feeding but the Government's denial of their meaningful access to counsel and the court – something all the individuals in the cases cited by the government unquestionably had.

---

[1] Notably, Respondents admit that "there are approximately 30 detainees currently on hunger strikes," Op. at 2 n.2, but refuse to reveal if any of Petitioners are involved. Some of undersigned counsel learned late last night that at least one of their clients is severely ill and has been force-fed, yet this information was never provided to his counsel. *See* Declaration of Jennifer Ching, Esq. filed in *Al-Joudi* v. *Bush,* No. 05-CV-0301(GK), attached hereto as Exh. L ("Ching Decl."). As set forth in the opening memorandum, all counsel for Petitioners have reason to believe their clients may be participating in hunger strikes.

[2] Despite the fact that Guantánamo personnel keep detailed records of detainees' food and water intake, *see* Op. at 2; Hood Declaration ¶ 5, Respondents continue to claim, with no supporting evidence, that "providing petitioners' counsel continuous reports on the health and hunger strike status of each detainee would be an overwhelming and unnecessary burden for Guantanamo staff members." Op. at 7-8 n. 8.

Without a doubt, the information by Petitioners is already readily available to Respondents; they just simply refuse to provide it. *See* Mot. Ex. K. In light of that refusal, and based on additional concerns that have arisen in the last few weeks, counsel for Petitioners request alternative means to obtain information about their clients' health and to protect their rights.

*First*, counsel for Petitioners request immediate visits by *representative* counsel, not by separate counsel for each Petitioner. Mot. at 15. While Petitioners do not believe that permitting visits from undersigned counsel – the only relevant inquiry here – would be unduly burdensome to Respondents, that is not the relief requested.[3] A visit by representative counsel would permit them to ascertain Petitioners' conditions and wishes and relay that information to other Petitioners' counsel. As Respondents note, counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners are scheduled to depart for Guantánamo early tomorrow morning and are prepared to meet with all Petitioners in lieu of individual meetings with all counsel.[4]

Moreover, any *habeas* counsel access must be accompanied by an assurance from the government that counsel will be permitted to meet with ill detainees wherever they are located. To undersigned counsel's knowledge, Respondents have not permitted *habeas* counsel to meet with their clients in the detainee hospital or in their

---

[3] However, requiring all *habeas* counsel to schedule visits to Guantánamo every 21 days if they wish to have any information about their clients' health, as suggested by Respondents, is unduly burdensome. *See* Op. at 5. Thus, Petitioners have requested other forms of relief, including telephonic access, that minimize the burden to them and Guantánamo personnel.

[4] The instant motion was originally filed on September 19, 2005, eleven days before counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners would be able to meet with their clients. Moreover, Respondents have not confirmed that they will permit access by *habeas* counsel to any Petitioners who are hospitalized and unable to be moved to Camp Echo for interviews.

living quarters. Yet a transfer to Camp Echo may not be medically appropriate for some Petitioners. Accordingly, a *habeas* counsel visit in an alternative location, such as the detainee hospital, must be permitted if necessary.

*Second*, Counsel for Petitioners request immediate telephonic access to their clients. As Respondents note, the health status of detainees fluctuates. Op. at 2 n.2. Thus, a visit by Petitioners' counsel several weeks ago does not satisfy the concerns raised in the instant motion. In fact, in recent days, counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners have received information related to the status of their clients, confirming that at least two have participated in a hunger strike over the past month, and that at least one has been hospitalized and force-fed via nasal tube. Rather than respond to counsel's formal request for information, the Government stonewalled access to this information, which instead has come to counsel after significant delay and after potentially irreversible damage to our clients' health. *See generally* Ching Decl. ¶ 7.

In addition, Respondents' interpretation of the Protective Order is incorrect. Counsel have substantiated reasons to believe their clients are in grave danger. This is precisely the sort of emergency situation that requires telephonic access by *habeas* counsel. Telephonic access may obviate the need for numerous counsel to travel to Guantanamo and spare both Petitioners' counsel and Respondents the associated burdens of such visits. *See* Mot. at 14-15.

*Third*, Petitioners' request telephonic access by Petitioners' Next Friends and families. Again, Respondents' grounds for refusal are unpersuasive. Telephonic access between detainees and their families is already permitted at Guantánamo for the four detainees who have been charged before the military commission there.

7

Furthermore, Respondents' opposition makes clear that many hunger striking detainees are being subjected to involuntary medical intervention. *See* Hood Declaration ¶ 8 ("I will authorize doctors to administer treatment without the consent of the detainee. . . . No request for such authorization has been denied."). The families of Petitioners may be able to convince them to cease the hunger strike, or consent to medical treatment. In addition, they may be able to ascertain the true condition of Petitioners who may be gravely ill but who conceal their condition from Respondents in order to avoid involuntary medical treatment. Moreover, denying telephonic access to Next Friends at such a critical moment flouts the purpose of Next Friend standing, which exists so that family members and otherse can protect the rights of detained prisoners who are unable to do so themselves because they are inaccessible. *See Whitmore* v. *Arkansas*, 495 U.S. 149, 162 (1990). Such access, which is clearly logistically feasible, should not be denied to Petitioners in such a grave, emergency situation.

*Finally*, counsel for Petitioners request access to Petitioners' medical records. Respondents' claim that Petitioners inappropriately seek discovery is simply not true. Counsel for Petitioners require access to Petitioners' medical records in order to adequately protect their interests in this specific, emergency situation. These records are necessary to protect the attorney-client relationship and so that Petitioners' counsel may fulfill their professional obligations to Petitioners. Petitioners are likely suffering severe psychological effects from prolonged starvation and may require counsel assistance in making medical decisions. The only way for Petitioners' counsel to ascertain Petitioners' true medical condition is to review the medical records in conjunction with in-person or

8

telephonic visit their clients. Petitioners' counsel can then properly advise their clients as to their legal rights.

Petitioners' counsel seek narrow, specific relief intended only to protect the health and welfare of Petitioners. Petitioners have a right to counsel. *See* Mot. at 11-12. In order for that right to have any meaning, Petitioners must be able to communicate with their counsel, and their counsel must be kept informed of the health status of their clients. In particular, Respondents' claim that there are simply too many detainees at Guantánamo to permit them to comply with the requested relief is disingenuous at best, and their theory has already been rejected by this Court. *See, e.g.*, Respondents' Motion to Stay Proceedings Pending Related Appeals and For Continued Coordination filed in *Al-Oshan* v. *Bush*, 05-0520 (RMU) (claiming administrative burden should excuse production of factual returns); Memorandum Order of April 7, 2005, issued in same (ordering production of factual returns within 45 days). Respondents choose to keep Petitioners and other detainees at Guantánamo; they must not be permitted to abdicate their responsibility to their charges simply because they have imprisoned too many of them. *See DeShaney* v. *Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

Providing Petitioners with a meaningful right to counsel is the compelling legal basis for requesting immediate access to Petitioners and records relating to the petitioners' medical treatment and meal schedules, as well as records regarding the military's policies and actions taken pertaining to hunger strikes. If the Court

9

acknowledges that Petitioners do in fact have a right to counsel, such counsel must be allowed to establish an attorney-client relationship with Petitioners. Access to the Petitioners and the requested records is essential providing the Petitioners with meaningful attorney representation.

## II. PETITIONERS ARE ENTITLED TO PROTECTIONS UNDER THE LAW.

The Government worries that "petitioners ultimately seek judicial intervention and oversight of the medical care provided by Guantánamo [sic] to hunger-striking detainees." Op. at 12. The Government's concerns are revealing: if, as the Government claims, "the health of all detainees, including those on hunger strike, is carefully managed by the Guantanamo staff," *id.* at 3, then the medical records would reflect such "careful management" and Petitioners would have no need to seek judicial intervention or oversight.

If, however, the medical records indicate that the Government is depriving Petitioners of adequate medical care, the Constitution entitles Petitioners to seek judicial redress to ensure that the Government meets their medical needs. Because Petitioners have not been convicted of a crime, they are protected by the Due Process Clause, not the Eighth Amendment's "deliberate indifference" standard. "[W]hile the convicted prisoner is entitled to protection only against punishment that is 'cruel and unusual,' the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subject to *any* form of 'punishment.'" *Slade* v. *Hampton Rds. Reg'l Jail*, 307 F.3d 243, 250 (4th Cir. 2005) (emphasis in original, quotations omitted). *See also Youngberg* v. *Romeo*, 457 U.S. 307, 321-22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose

conditions of confinement are designed to punish."); *Bell* v. *Wolfish*, 441 U.S. 520, 535-37 (1979) (holding that Constitution limits restrictions on liberty of individuals who have been charged with, but not convicted of, a crime).

Petitioners' right to medical treatment may be even greater than those of typical pretrial detainees. Unlike those merely charged with crimes, Petitioners have been detained solely on the Executive's say-so. "Petitioners' current designation as enemy combatants is not a foregone conclusion; challenges to the accuracy and legitimacy of the government's determination that Petitioners have engaged in hostilities against the United States, or aided those who have, are the very core of Petitioners' underlying habeas claims." *Abdah* v. *Bush*, No. Civ.A. 04-1254 (HHK), 2005 WL 711814, at *6 (D.D.C. Mar. 29, 2005). Moreover, whereas pretrial detainees are confined for the short period of time between arrest and trial, Petitioners have been held for nearly four years, and the Government asserts the right to detain them indefinitely. The Supreme Court has afforded even less deference towards the Government's treatment of those who, though having been convicted of no crime, "face lengthy and even lifelong confinement." *Patten* v. *Nichols*, 274 F.3d 829, 835 (4th Cir. 2001).

Even under the most deferential standard, published reports, many from the Government's own documents, illustrate that the Government cannot be trusted to provide even minimal medical care. Well before the hunger strike, suicide attempts proliferated under the Government's watch. *See* JA Singh, *Military Tribunals at Guantanamo Bay: Dual Loyalty Conflicts*, 362 The Lancet 573, 573 (2003) (Department of Defense statistics reveal that by June 2003, 18 detainees had attempted suicide 28 times). The Government has also declined to take any remedial action after an FBI

11

agent's firsthand observations that the Government denied detainees food and water. *See Executive Summary* of Dept. of Defense, *Investigation into FBI Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility* 13 (2005).

Indeed, the head doctor at Guantanamo faces an ethics complaint, filed before the California medical board, alleging that he "has supervised a system in which doctors sometimes withhold medicine from prisoners if they are deemed not cooperative enough with their interrogators." Neil A. Lewis, *Head of Hospital at Guantanamo Faces Complaint*, N.Y. Times, July 15, 2005, at A13. And Petitioners "medical records [have been] routinely shared with interrogators in clear breach of confidentiality and with the knowledge that such information can be misused." Editorial, *How Complicit are Doctors in Abuses of Detainees?*, 364 The Lancet 637, 637-38 (2004).

Yet the Government insists, citing the Hood Declaration, that "Guantanamo personnel have policies and practices in place for responding appropriately to hunger strikes." Op. at 17. It is well established that a "conclusory affidavit" is "insufficient to defeat plaintiffs' clear showing that they are entitled to a preliminary injunction." *Irving Trust Co. v. Braswell*, 596 F. Supp. 1441, 1444 (S.D.N.Y. 1984).[5] When considering other requests by Guantanamo detainees for injunctive relief, the courts have held that "declarations concerning general policy and practice . . . do not entirely refute Petitioners' claim or render them frivolous." *Abdah*, 2005 WL 711814, at

---

[5] Moreover, while the government says that it used the Department of Justice Regulations for the Bureau of Prisons "as the model" in establishing its procedures for the hunger strike (Hood Decl. ¶ 3), it neglects to mention that it has ignored virtually every other procedure established by the Bureau of Prisons, including those governing access to counsel and communication with family members.

12

*4 (dismissing Government's insistence the "policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured"). The Government's generalized averment falls particularly flat given that "*pro forma* reviews that were not based on actual evaluations of [a detainee's] clinical condition and progress" have been held to violate the Due Process Clause. *Leamer* v. *Fauver*, 288 F.3d 532, 546 n.9 (3d Cir. 2002).

The Government repeatedly cites *Hamdi* v. *Rumsfeld*, 124 S.Ct. 2633 (2004), *see* Op. at 16-17, nn. 18-19, in arguing that no judicial intervention is warranted. But the government, again, ignores *Hamdi*'s basic point that "a state of war is not a blank check for the President." *Id.* at 2650. The relief requested here – meaningful access to counsel and the Court – is modest as it is fundamental, and the danger to Petitioners grave. The motion should be granted.

WHEREFORE, for the reasons stated in their opening briefs, for the above-stated reasons and for any other reason that may become known to the Court, Petitioners respectfully request the Court grant the above requested relief.

Dated: New York, New York
September 28, 2005

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:
_____/s/_____
Julia Tarver (NY0029)
Jennifer Ching
Andrea J. Prasow

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Counsel for Petitioners Al-Oshan, et al. and Al-Subaiy*

**COVINGTON & BURLING**
David H. Remes
D.C. Bar No. 370782
1201 Pennsylvania Ave. NW
Washington, DC 20004
(202) 662-5212

Marc D. Falkoff
D.C. Bar. No. 491149
1330 Avenue of the Americas
New York, NY 10019
(212) 841-1166

*Counsel for Petitioners Al-Hela, et al.
and Hatim, et al.*

**DEBEVOISE & PLIMPTON LLP**
John B. Missing (Bar No. 425469)
Jennifer C. Argabright (Bar. No. 480763)
555 13th Street, N.W. Ste 1100E
Washington, D.C. 20004-1169

14

(202) 383-8000

Jeffrey I. Lang
Jennifer R. Cowan
Ellen A. Hochberg
Tatia L. Miller
Hadassa Waxman
919 Third Avenue
New York, NY 10022
(212) 909-6000


*Of Counsel*

**CENTER FOR CONSTITUTIONAL RIGHTS**
Barbara Olshansky
Gitanjali Gutierrez
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

*Counsel for Petitioners Bin Amir et al.*

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAJID ABDULLA AL JOUDI, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | Civil Action No. 05-0301 (GK) |

### DECLARATION BY JENNIFER CHING, ESQ.

I, Jennifer Ching, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am associated with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for the *Al Joudi* Petitioners in the above-captioned action. I offer this Declaration in support of Petitioners' Motion to Compel Access to Counsel and Information Related to Petitioners' Medical Treatment.

2. On the evening of September 27, 2005, I traveled from my office, in New York, New York to Springfield, Massachusetts. The purpose of my trip was to meet with *habeas* counsel Stewart Eisenberg, Esq., of Weinberg & Garber P.C. Mr. Eisenberg represents Abdul Salam Gaithan Mureef Al-Shihry, an individual who is detained at Guantánamo with Petitioners in the above-captioned proceeding. *See Al-Shihry v. Bush*, Docket No. 05-490 (PLF).

3. Because Mr. Eisenberg had only just returned from Guantánamo on September 26, 2005, he had not yet received approval from the Department of Justice to provide to me information via the telephone, fax or electronic mail conveyed to him by

his client and therefore presumptively deemed protected under the Protective Orders governing our cases. As a result, we agreed to meet in Massachusetts to discuss this information, in person, under the conditions provided by the Protective Orders.

4. I believe that the information provided to me by Mr. Eisenberg has a direct impact on Petitioners' motion, and raises serious issues of concern.

5. On September 28, 2005, upon returning from Massachusetts, I contacted Andrew Warden, Trial Attorney with the United States Department of Justice. I informed Mr. Warden that (1) I had met with counsel in Massachusetts regarding information presumed protected; (2) the information had a direct bearing on a matter before the Court related to the hunger strike and access to counsel; (3) due to the time constraint of our filing deadline and our travel to Guantánamo on the morning of September 29, 2005, I was unable to travel to the secure facility in Washington D.C. to prepare our motion, or wait for the information to be deemed available for use in the filing by the Department of Justice; and (4) I had a good faith belief that the information conveyed to me by Mr. Eisenberg, which solely dealt with the health condition of our client, was not classified and was generally identical to information that has been previously released for public filing.

6. Mr. Warden advised me to prepare our filing with the information about our client therein and convey it to the Court Security Office for clearance for public filing by the Department of Justice. I agreed to do so.

7. The information Mr. Eisenberg provided me is as follows:

    a) According to his client, Mr. Al-Shihri, with whom he had met earlier this week, our client – who previously participated in a

2

hunger strike to the point of hospitalization and intraveneous force-feeding, *see generally* Tarver Decl. – restarted a hunger strike after our last meeting in July.

b) As a result of his hunger strike, since August, our client has been hospitalized and force-fed through his nose, which he resisted.

c) Our client had been released from the hospital a few days before Mr. Eisenberg's meeting, but was continuing his hunger strike and was described by Mr. Eisenberg's client as unrecognizable, and deathly ill.

d) Mr. Eisenberg's client also informed him that our client has made clear his intention to die, and his resistance to any force-feeding.

8. Based on this information, and my own impressions from our last meeting with our client in July, I believe that our client's health is in grave danger. Although I understand that the Government takes legal steps to preserve an individual's life, the primary concern of counsel is an ultimately humane one – not focused on the scientific process of feeding, but the ability we have, as counsel, to support, advise and assist our clients in the decisions they make that affect their lives.

9. I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of September 2005
New York, New York

　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　Jennifer Ching

3