*CLEARED FOR PUBLIC FILING*
*BY PERMISSION OF THE CSO*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALEH ABDULLA AL-OSHAN, *et al.*, | Civil Action No. 05-0520 (RMU) |
| Petitioners/Plaintiffs, | |
| v. | |
| GEORGE W. BUSH, *et al.*, | |
| Respondents/Defendants. | |
| NASSER MAZYAD AL-SUBAIY, | Civil Action No. 05-CV-1453 (RMU) |
| Petitioner/Plaintiff, | |
| v. | |
| GEORGE W. BUSH, *et al.*, | |
| Respondents/Defendants. | |

### PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION
### TO EXAMINE PRIVILEGED COMMUNICATIONS SEIZED
### WITHOUT NOTICE OR APPROVAL OF THE COURT

*CLEARED FOR PUBLIC FILING*
*BY PERMISSION OF THE CSO*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................II

INTRODUCTION .............................................................................................................1

SUMMARY OF FACTS....................................................................................................3

ARGUMENT.....................................................................................................................5

I.   RESPONDENTS' UNILATERAL SEIZURE AND EXAMINATION OF
     PETITIONERS' LEGAL PAPERS WAS UNLAWFUL. ........................................5

     A.   Respondents Have Violated the Court Orders Governing Counsel Access and
          Communications with Clients in the Guantánamo Cases ...............................5

     B.   Petitioners' Legal Papers May Not Be Seized and Reviewed Without An
          Individualized Showing of Probable Cause. ....................................................6

     C.   Respondents Have Made No Such Individualized Showing With Respect to
          Petitioners' Attorney-Client Communications. ...............................................9

     D.   Far From an Individualized Showing, Respondents' Unlawful Seizure of
          Attorney-Client Communications is Nothing More Than a Pretense for
          Reviewing Confidential Communications. .....................................................10

II.  ANY FURTHER REVIEW OF THE PRISONERS' LEGAL PAPERS SHOULD BE
     BY THE COURT OR COUNSEL FOR PETITIONERS....................................12

CONCLUSION................................................................................................................15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Al-Odah* v. *United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) ........................................ 5, 6, 10, 13

*Bach* v. *Illinois*, 504 F.2d 1100 (7th Cir. 1974) ............................................................ 6, 7

*Bell* v. *Wolfish*, 441 U.S. 520 (1979) ................................................................................ 8

*Black* v. *United States*, 172 F.R.D. 511 (S.D. Fla. 1997) ................................................ 12

*Block* v. *Rutherford*, 468 U.S. 576 (1984) ....................................................................... 8

*Doe* v. *United States*, 2003 WL. 22879314 (2d Cir. Dec. 4, 2003) ................................... 8

*Goff* v. *Nix*, 113 F.3d 887 (8th Cir. 1997) ....................................................................... 7

*Hudson* v. *Reno*, 458 U.S. 517 (1984) ............................................................................. 8

*In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32 (2d Cir. 1986) ................... 8, 14

*In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275 (6th Cir. July 13, 2006) ...................................................................................................................... 12

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995) ........................................................... 8

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997) ............................................................. 8

*In re Search of the Scranton Hous. Auth.*, 2006 WL. 1722565 (M.D. Pa. Jun. 22, 2006) 12

*In re Search Warrant for Law Offices*, 153 F.R.D. 55 (S.D.N.Y. 1994) ......................... 13

*Lonegan* v. *Hasty*, 2006 WL 1707258 (E.D.N.Y. June 22, 2006) ..................................... 7

*Sallier* v. *Brooks*, 343 F.3d 868 (6th Cir. 2003) ............................................................... 7

*United States* v. *Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995) ............................................ 12

*United States* v. *Defonte*, 441 F.3d 92 (2d Cir. 20006) .................................................... 6

*United States* v. *Grant*, 2004 WL 1171258 (S.D.N.Y. Dec. 14, 1982) ............................. 9

*United States* v. *Neill*, 952 F. Supp. 834 (D.D.C. 1997) ................................................. 13

*United States* v. *Skeddle*, 989 F. Supp. 890 (N.D. Ohio 1997) ........................................ 8

*United States* v. *Stewart*, 2002 WL. 1300059 (S.D.N.Y. June 11, 2002) .................... 8, 13

*United States* v. *Zolin*, 491 U.S. 554 (1989) .................................................................... 9

*Upjohn Co.* v. *United States*, 449 U.S. 383 (1981) ........................................................... 6

## STATUTES

Fed. R. Evid. 1101(c) .......................................................................................................... 7

*CLEARED FOR PUBLIC FILING*
*BY PERMISSION OF THE CSO*

## INTRODUCTION

Respondents have engaged in unlawful, retaliatory and self-help actions which violate, without any legitimate justification, the fundamental principle of attorney-client communications. Respondents' actions impermissibly interfere with Petitioners' privileged and protected relationship with counsel and have no other effect but to shatter the trust and confidence between counsel and client. Despite the strict and circumscribed procedures mandating the Court's approval for any deviance from the principles of counsel access governing this case, *see* Order, entered Apr. 29, 2005 (Dkt. 26), Respondents here seek the Court's *post-hoc* authorization for the United States Department of Defense to review over a half-ton of attorney-client communications seized by Respondents from Petitioners over one month ago, without notice or approval. Respondents base their application on nothing more than a handful of documents, none of which have been disclosed to Petitioners or the Court, including notes from the deceased and a document which appears to have come from the government itself. This showing does not warrant the drastic measures that Respondents seek.

Respondents' motion should be denied. As a matter of fundamental principle, and by specific order of this Court, attorney-client communications are to be secure against seizure and review by the government. Respondents' seizure and review of those communications, without prior notice to and approval by the Court, is illegal. Furthermore, Respondents' failure to disclose the nature of its actions to the Court and counsel until nearly a month after the fact—and then only when *habeas* counsel filed a motion requesting the immediate return of such docu-

ments[1]—is without justification. Indeed, the American Bar Association has called for an investigation of the military's massive breach of the privilege.[2]

Counsel for Petitioners do not diminish the urgency of the situation which has given rise to Respondents' investigation and which forms the ostensible basis of Respondents' application. But the deaths of prisoners Mani Shaman Turki al-Habardi Al-Utaybi, Yassar Talal Al-Zahrani and Ali Abdullah Ahmed were not, as the government has asserted, acts of "assymetrical warfare," but more likely the inevitable results of nearly five years of isolated imprisonment, without access to families or loved ones, without charges or fair proceedings, and with being subject to acts of violence, cruelty and abuse. By Respondents' own admission, there have been hundreds of attempts at self-harm by Guantánamo prisoners since 2002, as well as over 140 acknowledged hanging attempts. Indeed, counsel for Petitioners have made formal applications requesting that Respondents take specific actions to avoid the deaths of any prisoners, in particular, those manifesting potential injury to oneself. Respondents, however, have opposed these and all other motions brought by *habeas* counsel to ensure access to counsel and to assist in the psychiatric and medical care of prisoners, including Petitioners.

In light of the above, the Court should reject Respondents' application and order Respondents to immediately return Petitioners' legal papers to counsel and to destroy any copies. If the Court decides to allow any further review—and Petitioners respectfully aver that such review should occur only after Respondents make an individualized showing of probable cause with re-

---

[1]    *See* Motion to Modify Stay to Direct Respondents to Return Impounded Privileged Legal Material and for Other Relief, *Abdullah* v. *Bush*, No. 05-023 (RWR) (July 5, 2006).

[2]    *See* Letter dated July 11, 2006, from Michael S. Greco, President, American Bar Association, to Senators Arlen Specter and Patrick Leahy (attached as Ex. A).

spect to an individual prisoner—Respondents should not be allowed to use the review as a fishing expedition, nor should the review should not take place under the auspices of the Department of Defense.  Any review of privileged, legal materials should be conducted in the first instance by either the Court or counsel for Petitioners.

## SUMMARY OF FACTS

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been found dead in their cells with wads of cloth stuck in their mouths.[3]  The military reported the prisoners' deaths as suicides.[4]  In a news conference, Navy Rear Adm. Harry B. Harris, the commander of Joint Task Force–Guantánamo, denounced the deaths as acts of war:  "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo," he said. "We have men here who are committed jihadists. They are dangerous men and they will do anything they can to advance their cause."[5]  Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths a "good PR move."[6]

---

[3]      In the days immediately following the deaths, Colonel Mike Bumgarner, Commander of Guantanamo, stated in an interview that each of the prisoners was found with "a large wad of cloth in his mouth"; Colonel Bumgarner stated that he "did not know if the material was for choking or to muffle their voices while they took their lives." Michael Gordon, *Officer Expects More Suicide Tries*, Charlotte Observer, June 12, 2006, *available at* http://www.charlotte.com/mld/charlotte/news/14797522.htm.

[4]      U.S. Southern Command News Release, *Three Detainee Deaths at Guantanamo Bay*, June 10, 2006, *available at* http://www.southcom.mil/pa/Media/Releases/USSOUTHCOM%20 PRESREL%20Detainee%20Death%20FINAL%20%20(1415%2010%20Jun%2006).doc; *Gen. John Craddock's Opening Statement*, Press Conference, June 10, 2006, *available at* http://www. southcom.mil/pa/News/June%202006/News060610-001.htm; Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/ news/Jun2006/20060610_5379.html.

[5]      Wood, *supra* note 4.

3

According to the declarations of Admiral Harris and Special Agent Carol Kisthardt, the Naval Criminal Investigative Service (NCIS) initiated an investigation to determine "the manner and cause of death" of the three prisoners." Harris Decl. ¶ 2; Kisthardt Decl. ¶ 2. Autopsies were to be performed, but results have not been made public.

Counsel were not informed of the seizure of Petitioners' documents until Respondents sent an email to *habeas* counsel on June 30, 2006 informing them that certain materials had been confiscated for the purposes of investigation. *See* Email from Terry Henry to Barbara Olshansky (June 30, 2006) (attached as Ex. B). It was not until Respondents filed the instant motion, nearly a *month* later, that they disclosed that, between June 10 and June 14, as part of the purported "investigation," NCIS seized *and examined* attorney-client communications between Guantánamo prisoners and their lawyers. *See* Kisthardt Decl. ¶¶ 2-5. Respondents claim that they seized the prisoners' legal papers because notes found in the cells of the dead prisoners suggested that the prisoners might have used the cloak of the attorney-client privilege in furtherance of a suicide "plot" by the prisoners, perhaps "encouraged, ordered, or assisted by third parties." Harris Decl. ¶ 4. Respondents have not provided the Court or counsel with the documents in question.

---

[6]    Catherine Philp, *US Dismisses Suicides as "PR Stunt,"* London Times, June 12, 2006, *available at* http://www.timesonline.co.uk/article/0,,11069-2221381,00.html; *see also* Reuters, *Three Guantanamo Detainees Die, US Army,* June 11, 2006, *available at* http://www.cageprisoners.com/articles.php?id=14371.

## ARGUMENT

I.    **RESPONDENTS' UNILATERAL SEIZURE AND EXAMINATION OF PETITIONERS' LEGAL PAPERS WAS UNLAWFUL.**

A.    **Respondents Have Violated the Court Orders Governing Counsel Access and Communications with Clients in the Guantánamo Cases**

This Court has ruled that prisoners held at Guantánamo have a right to representation by counsel, and has set forth clear procedures to ensure Petitioners' access to and communications with counsel that are balanced with Respondents' penological interests.  Recognizing that the attorney-client privilege attaches to communications between Petitioners and their lawyers, the Court has gone to great lengths to protect that privilege by creating access procedures protecting the confidentiality of attorney-client communications.  Nonetheless, by their own admission, beginning June 10, 2006, without authority of the Court or notice to counsel, Respondents "conduct[ed] a preliminary scan" of attorney-client communications and "separat[ed] privileged information from non-privileged information" seized from detainees. Resp. Mot. at 7.  By unilaterally seizing, examining and withholding attorney-client communications, Respondents have flouted Petitioners' right to confidential communications with counsel and the procedures governing these cases.  The Court should not ratify the government's violations of the Court's orders by permitting the Department of Defense to further review the privileged communications that it has seized.  Respondents have violated the explicit holding of the Court, *see Al-Odah* v. *United States*, 346 F. Supp. 1, 5 (D.D.C. 2004), as well as the Protective Order and Counsel Access Procedures governing this case, *see* Order, entered Apr. 29, 2005 (Dkt. 26), which requires parties to bring any potential interference with these procedures to the immediate attention of the Court.

The Court has recognized that Petitioners, who filed the instant *habeas* proceedings to challenge the basis of their detention without trial, have a right to counsel and are entitled to a

confidential relationship with their counsel. *See Al Odah*, 346 F. Supp. 2d at 5. Thus, in *Al Odah*, Judge Kollar-Kotelly "determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them." *Id.* Respondents have done that which is explicitly barred by the Court. Indeed, Respondents do not attempt to justify their actions under the Protective Order, but rather admit that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege." Resp. Mot. at 9. Thus, Respondents have violated the Court's explicit Order and for this reason alone, their motion should be denied.

**B.    Petitioners' Legal Papers May Not Be Seized and Reviewed Without An Individualized Showing of Probable Cause.**

Respondents' unilateral abrogation of the privilege would have been unlawful even if it had not directly violated an Order of the Court. The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* As noted above, this principle has been upheld by this Court in the *habeas* proceedings initiated by Guantánamo prisoners. *See Al Odah*, 346 F. Supp. 2d at 10 ("The privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States.").

It is well-established that incarcerated or detained individuals do not forfeit the attorney-client privilege upon detention. *See United States* v. *Defonte*, 441 F.3d 92, 94 (2d Cir. 20006). "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important." *Bach* v. *Illinois*, 504 F.2d 1100,

6

1102 (7th Cir. 1974). For prisoners, and petitioners in *habeas* proceedings, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts." *Bach*, 504 F.2d at 1102. *See also* Fed. R. Evid. 1101(c).

Nor do individuals suspected of terrorist acts lose this privilege when it is balanced against national security interests. *See Lonegan* v. *Hasty*, 2006 WL 1707258, at *18 (E.D.N.Y. June 22, 2006) (holding that a terrorism suspect and his attorney had a "constitutionally protected reasonable expectation of privacy in their communications"). Under any circumstances, courts generally act with "heightened concern" when prison officials open and read mail that "has import for . . . the attorney-client privilege." *Sallier* v. *Brooks*, 343 F.3d 868, 874 (6th Cir. 2003). The wholesale seizure of attorney-client communications strikes at the heart of Petitioners' relationship with counsel and interferes with the inmate's access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest." *Goff* v. *Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted). Here, Respondents' actions—seizing *all* legal documents from *all* prisoners, without individualized showing and the Court's approval—are not "reasonably related" to a "legitimate penological interest." Notably, Respondents have failed to demonstrate how the documents relied upon in their motion support the incredibly disproportionate response of seizing over a half-ton of privileged communications from all of the prisoners, including Petitioners. Furthermore, Respondents' actions significantly interfere with a Petitioners' access to courts and chills the giving, receiving, and

continued possession of communications from attorney to client, particularly when seized without notice to the counsel or the Court.

Abrogation of the attorney-client privilege in any context requires Respondents to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege. For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies—*i.e.,* that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act. *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997).[7] Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials. *See, e.g., United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

Respondents have not cited any cases that suggest the privilege may be invaded without an *individualized,* sufficiently rigorous showing that materials of a particular client or attorney are likely to have been abused in furtherance of a crime.[8] *See, e.g., United States v. Skeddle*, 989

---

[7]      *See also Doe v. United States*, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[8] None of the cases cited by Respondents to justify their substantive review of attorney-client communications involved a prison-wide search and confiscation of such materials. Rather, the searches in Respondents' brief were searches for contraband, such as is already required by the Protective Order. *See Bell v. Wolfish,* 441 U.S. 520, 555-57 (1979) (search for contraband);

(continued...)

F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States* v. *Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause"). Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States* v. *Zolin*, 491 U.S. 554, 572 (1989) (quotations and citations omitted).

## C. Respondents Have Made No Such Individualized Showing With Respect to Petitioners' Attorney-Client Communications.

Respondents have presented no specific evidence that any prisoners, including Petitioners, have misused their attorney-client materials. Indeed, Respondents do not even purport to do so, and the examples they cite fail to justify the unilateral seizure of over half-a-ton of privileged materials from hundreds of prisoners. These documents offer little support for Respondents' position that attorney-client materials are being misused—let alone specific evidence that any of Petitioners in this *habeas* proceeding have misused such materials. Instead, Respondents base their unlawful actions on the following:

- Handwritten suicide notes;

---

*Hudson* v. *Reno*, 458 U.S. 517, 527 (1984) (search for drugs or contraband); *Block* v. *Rutherford*, 468 U.S. 576, 589-92 (1984) (search of cell for contraband).

- non-classified materials found in the possession of prisoners, including documents marked "FOUO," which are, by designation of the Department of Defense, unclassified, or documents which the government has marked unclassified;

- a so-called "knot-tying" document, which, by Respondents' own description, is not written on anything indicating attorney-client communications;

- a JTF-Guantánamo communication, which presumably originated from a member of the government, and not counsel, who does not have access to such communications.

Respondents' generalized security concerns are of the type already rejected by the courts. For example, when Respondents sought to justify the real-time monitoring and recording of attorney-client meetings, claiming that the prisoners would use meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security," *Al Odah*, 346 F. Supp. 2d at 4 n.4, the Court rejected the government's claims, finding them "thinly supported." *Id.* at 14. As for Respondents' speculation that Petitioners' counsel are improperly sharing classified information with their clients, the *Al Odah* Court long ago reminded the government that "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance." *Id.*

## D.    Far From an Individualized Showing, Respondents' Unlawful Seizure of Attorney-Client Communications is Nothing More Than a Pretense for Reviewing Confidential Communications.

Respondents' attempt to portray prisoner deaths as acts of "warfare" are a transparent effort to avoid the government's responsibility for the underlying conditions which gave rise to these deaths. Respondents' claims of suicide "plots" among the prisoners, possibly implicating "third parties," are here just a pretext for seizing and examining privileged communications. The

prisoners have long engaged in coordinated "self-harm" activity, from hunger strikes to mass hangings. Respondents, however, have consistently sought to minimize such concerted activity. *See* Mark Denbeaux, *et al.*, *Report: The Guantanamo Detainees During Detention* (July 10, 2006) (attached as Ex. C). Respondents' history of indifference contrasts with its current contention that the search for further "plots" justifies ransacking the prisoners' legal papers. It is well-documented that prisoners, including Petitioners, have been subjected to a variety of other cruel, inhuman, and degrading treatment, including prolonged exposure to extreme heat and cold, religious humiliations (including abuse of the Koran and interference with prayers), threats of execution, threats against family, and prolonged solitary confinement. In the face of such abuses, it is not surprising that individuals would attempt to take their own lives. And, in fact, such actions have been occurring since 2002. According to government data, prisoners committed 350 acts of "self-harm" in 2003, of which 120 were attempted hangings. *Id.* at 6. In August 2003, 23 men attempted to hang themselves. *Id.* The government chose to describe all but two of these hangings as incidents of "manipulative self-injurious behavior," rather than as suicide attempts. *Id.* at 14. In 2004, also according to government data, prisoners committed another 110 acts of "manipulative self-injurious behavior," though it did not report how many of these 110 incidents were attempted hangings. *Id.* at 6. Even with its penchant for defining away suicides as "manipulative self-injurious behavior," the government has acknowledged that 29 prisoners have attempted suicide a total of 41 times. And, in addition to the above, numerous prisoners have also attempted to starve themselves to death, engaging in hunger strikes to protest their continued detention. In response to their actions, Respondents have subjected hunger striking detainees to brutal force-feeding tactics, beatings and abusive treatment. *See* Emergency Mot. for Injunction Against Further Torture of Mohammed Bawazir, *Al-Adahi* v. *Bush*, 05-280 (GK) (Feb. 24,

11

2006); Mot. to Compel Access to Counsel and Information Related to Medical Treatment, *Al Joudi* v. *Bush*, 05-301 (GK) (Sept. 16, 2005).

This past June, once again refusing to engage the assistance of counsel to address the issues raised by the deaths of three prisoners, Respondents took the unilateral action of seizing and reviewing attorney-client communications. Such a breach of the privilege should not be tolerated. The Court should deny Respondents' motion and order the immediate return of Petitioners' attorney-client communications.

## II.   ANY FURTHER REVIEW OF THE PRISONERS' LEGAL PAPERS SHOULD BE BY THE COURT OR COUNSEL FOR PETITIONERS.

If the further review of Petitioners' legal papers is allowed, the use of a Department of Defense Filter Team is inappropriate here. Courts are reluctant to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts." *In re Search of the Scranton Hous. Auth.*, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006). *See also Black* v. *United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege"); *United States* v. *Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant). Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege. *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006). Even when such teams have been authorized, "at least

12

three courts that have allowed for review by a government privilege team have opined, in retro-spect, that the use of other methods of review would have been better." *United States* v. *Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

Especially given Respondents' history of interfering with the attorney-client relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of monitored at-torney-client communications, *Al Odah*, 346 F. Supp. 2d at 10 n.11, "it is important that the procedure adopted on this case not only be fair but also appear to be fair." *Stewart*, 2002 WL 1300059, at *8. Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]." *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994). Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness." *United States* v. *Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

Concerns about the appearance of propriety are especially important here, given the diffi-culties that counsel has experienced in gaining the prisoners' trust. Before meeting with counsel in the aftermath of *Rasul*, Petitioners had "been detained virtually incommunicado for nearly three years without being charged with any crime." *Al Odah*, 346 F. Supp. 2d at 12. Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and almost cer-tainly lack a working knowledge of the American legal system." *Id.* Worse, as a result of state-ments from interrogators and other government personnel, many Petitioners suspect that their ci-vilian attorneys are simply guards or interrogators in disguise. These suspicions will only inten-sify when Petitioners learn that their attorney-client materials are being reviewed by lawyers for the military that detains and interrogates them.

13

Another unacceptable aspect of Respondents' proposal is their suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation. Resp. Mot. at 11. If the Department of Defense determines that the documents are not privileged, Respondents propose, then they will be "returned . . . to JTF-Guantánamo for appropriate action." *Id.* Such a review for privilege leaves "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate claims of privilege. *In re Grand Jury Subpoenas*, slip op. at 10.

Respondents' motion is a patent attempt to chill attorney-client communications. In it, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system." Resp. Mot. at 10. This unfounded assertion is a not-so disguised threat to counsel, designed to deter them from communicating effectively with their clients. This threat demonstrates the impropriety of the government's plan.[9]

Accordingly, should the Court deem it appropriate to conduct a further review of the documents in question, Petitioners respectfully submit that Respondents' proposal for a review by the Department of Defense is wholly inappropriate, and instead request that the Court undertake any such review or allow counsel to do so.

---

[9] Indeed, buried in a footnote is Respondents' conclusion that because counsel is prohibited "from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action." Resp. Mot. at 10 n. 11.

## CONCLUSION

For the reasons set forth above, Respondents' motion should be denied and the Court should order Respondents to immediately return Petitioners' legal materials.

Dated: New York, New York
      July 21, 2006

                      Respectfully submitted,

                      **PAUL, WEISS, RIFKIND, WHARTON**
                            **& GARRISON LLP**

                      By:_____/s/_____
                          Julia Tarver Mason (NY0029)
                          Martin Flumenbaum
                          Jennifer Ching
                          Jana Ramsey

                      1285 Avenue of the Americas
                      New York, New York 10019-6064
                      (212) 373-3000